**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PHILLIP SULLIVAN, JR.,

       Plaintiff,

         -against-

DOCTOR'S ASSOCIATES LLC,
GEETA FASTFOOD ENTERPRISE INC,
and ABHIMANUE MANCHANDA,

       Defendants.

---

Case No.:  19-CV-00719

**<u>SECOND AMENDED CLASS</u>**
**<u>ACTION COMPLAINT</u>**

**JURY TRIAL DEMANDED**

Plaintiff, PHILLIP SULLIVAN, JR. (hereinafter "Plaintiff SULLIVAN" or "Plaintiff"), by and through his undersigned attorney, hereby files this Second Amended Class Action Complaint against DOCTOR'S ASSOCIATES LLC, GEETA FASTFOOD ENTERPRISE INC, and ABHIMANUE MANCHANDA (collectively, "Defendants"), pursuant to 42 U.S.C. § 12181, *et seq.*, of the Americans with Disabilities Act of 1990 ("ADA"), New York State Human Rights Law, N.Y. Exec. Law, Article 15 (Executive Law § 290 *et seq.*), New York State Civil Rights Law,  NY CLS Civ R, Article 4 (CLS Civ R § 40 et seq.), and the New York City Human Rights Law, N.Y.C. Administrative Code § 8-101 *et seq*. ("City Law") (together, the "New York Laws").

## PRELIMINARY STATEMENT

1.     Plaintiff PHILLIP SULLIVAN, JR. is a deaf individual who communicates primarily in American Sign Language, which is his expressed, preferred, and most effective means of communication. Plaintiff was rudely treated, refused service, and discriminated against on the basis of his disability when he attempted to purchase food from a Subway restaurant in New York State. Through the discriminatory treatment he faced, and because of the failure to provide readily available technological aids to the hearing impaired, Plaintiff learned that Subway restaurants are inaccessible to deaf individuals and that Subway restaurants' employees, managers, and franchisees are inadequately trained and improperly educated about the rights and needs of deaf individuals.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343, and 1367 for Plaintiff's claims arising under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.* ("ADA").

3.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, over Plaintiff's pendent claims under the New York State Human Rights Law, N.Y. Exec. Law, Article 15 (Executive Law § 290 *et seq.*) and the New York City Human Rights Law, N.Y.C. Administrative Code § 8-101 *et seq.* ("City Law").

4.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1441(a).

5.     Defendants are registered to do business in New York State and have been doing business in New York State, including the Southern District of New York. Defendants have been and are committing the acts alleged herein in the Southern District of New York, have been and

are violating the rights of the disabled in the Southern District of New York, and have been and are causing injury to the diabled in the Southern District of New York. A substantial part of the acts and omissions giving rise to Plaintiff's claims have occurred in the Southern District of New York.

## PARTIES

6.     Plaintiff SULLIVAN is and has been at all times material hereto a resident of New York County, New York.

7.     Plaintiff is legally deaf and a member of a protected class under the ADA, 42 U.S.C. § 12102(1)-(2), the regulations implementing the ADA set forth at 28 CFR § 36.101 *et seq.*, the New York State Human Rights Law, and the New York City Human Rights Law.

8.     Defendant Doctor's Associates, LLC (hereinafter, "DAL") is a Florida limited liability company with a principal address located at 8400 NW 36th St. Suite 530, Doral, FL 33166 and a mailing address at 325 Sub Way, Milford, CT 06461. DAL has a registered agent, Corporation Service Company, with the address 1201 Hays Street, Tallahassee, FL 32301.

9.     DAL is the franchisor of Subway restaurants. Subway is a fast-food restaurant franchise that primarily sells submarine sandwiches, with over 26,000 franchise restaurants in the United States. Subway is the largest franchise, single-brand restaurant chain, and restaurant operator in the world.

10.    Defendant GEETA FASTFOOD ENTERPRISE INC (hereinafter "Defendant Geeta Fastfood") is the franchisee which holds the business license to operate the Subway restaurant located at 223 Avenue B, New York, NY 10009. Defendant Geeta Fastfood is a New York business corporation which has a DOS Process agent, Ashok Kumar, with the address 573 Main Street, New Rochelle, New York 10801.

3

11.     Defendant Abhimanue Manchanda (hereinafter "Defendant Manchanda") is the owner of the Subway restaurant located at 223 Avenue B, New York, NY 10009 (hereinafter the "Restaurant" or "Subway Restaurant"), under the business entity Geeta Fastfood Enterprise Inc.. Defendant Manchanda exercises actual control over the day-to-day operations of the Subway Restaurant.

12.     Defendants GEETA FASTFOOD ENTERPRISE INC and Abhimanue Manchanda referred to collectively as the "New York Defendants."

13.     The Restaurant is a public accommodation under federal and state antidiscrimination laws and is subject to the requirements thereof.

14.     DAL is the franchisor of Subway restaurants and has extensive control over the way its franchisees operate the business. As the franchisor, DAL is responsible for setting company policy and providing adequate ongoing training on a regular basis to franchise owners. It is also responsible for providing ongoing support and necessary tools and resources to its franchise owners, including regular training and education on providing proper access to individuals with disabilities under the ADA. DAL is additionally responsible for addressing any concerns or issues that may arise as well as maintaining overall brand reputation, awareness, and development.

15.     DAL has actual control and responsibility over all Subway restaurants' compliance, adherence to laws, franchisee training, and the way franchise owners conduct their business, as well as setting Employment Practices and Code of Conduct policy for all franchisees. DAL controls operations, including the type of equipment, point-of-sale system, trademarks, decoration, look and feel of each franchise.

16.     By and through a standardized franchise agreement that is used for the creation and operation of all franchise restaurants across the United States, and a standardized Operations

Manual referenced in the franchise agreement, DAL exercises control over ADA compliance and anti-discrimination employment training of its franchise restaurants throughout the United States. DAL controls and directs employee training protocol and ADA compliance of its franchise restaurants across the United States, including with respect to the removal of the existing access barriers. All Subway franchise restaurants across the United States are created and operated through a standardized franchise agreement between DAL and its franchisees.

17.    A copy of the franchise agreement between DAL and the New York Defendants is annexed as **Exhibit A**.[1] It is substantially identical to the agreements that DAL employs with all its franchisees. This agreement demonstrates the degree of control that DAL exercises over its franchisees, a control so extensive that it may be said to operate its franchisee locations.

18.    Section 5(a)(iii) of the agreement provides, "[t]he [franchise restaurant] will be at a location found by [franchisee] and approved by [Defendant Doctor's Associates] with consideration given to the requirements of the Americans with Disabilities Act ('ADA')." A franchise agreement can be terminated by DAL with a ninety days' written notice if a franchisee does not perform all of the terms and conditions of the agreement, including Section 5(a)(iii). *See* 8.b of **Exhibits A**.

19.    When the New York Defendants and other franchisees across the United States purchase a franchise from DAL, they purchase a "proprietary system for establishing and operating restaurants". *See Id.*, Section A. The Subway restaurant operating system ("Operating System") is both comprehensive and mandatory. It addresses all aspects of the operation of Subway restaurants

---

[1] All sample franchise agreements were public records disclosed by Defendant Doctor's Associates in legal actions enforcing arbitral awards against its franchise restaurant owners based on the theory of breach of franchise agreement. Plaintiff received a copy of the Franchise Agreement between Defendant Doctor's Associates and Individual Defendant Manchanda pursuant to a protective order.

across the United States; and under the terms of the franchise agreement, the licensee is required to operate the restaurant in compliance with all Operating System at all times.

20.     In addition to requiring compliance with the Operating System, the franchise agreement give DAL several additional means of control over the operation of Subway restaurants. For example, franchisees must attend a mandatory training program provided by DAL and "achieve a passing score on [a] standardized test conducted during the training program", *Id.*, Section 1(a); "[DAL] may, at [its] option and without prejudice to any of [its] other rights or remedies provided under this Agreement, terminate this Agreement  without an opportunity to remedy the default unless prohibited by law if [] [franchisees] are dismissed from the training program []." *Id.,* Section 8(c)(vi); and the restaurant must be operated "in accordance with [DAL's] Operations Manual which contains mandatory and suggested specifications, standards and operating procedures, and may be updated as a result of [] changes in the law []" *Id.*, Section 5(b)(ii). Franchisees must make any change necessary to conform to the Operations Manual, which may be amended at any time by DAL, which has full authority to change any part of the business operations of franchisees and make the franchisees pay for the cost of compliance.

21.     Section 5(b)(i) of the franchise agreement states the franchisees must "operate [] in accordance with all existing and future applicable laws and governmental regulations," and franchisees must "pay all fees and costs associated with such compliance," and DAL reserves the right to request documentation from franchisees to show compliance with laws. Finally, under Section 5(a)(iii) and (iv) of the franchise agreement, all restaurant locations are leased by franchisor and subleased to franchisee. Franchisees must construct and equip restaurants to specifications dictated by DAL, which may be changed by DAL at any time.

22.     Additionally, Section 5(f) of the agreement discloses that DAL exercises direct operational control over both the hardware and software of franchisees' point-of-sale systems ("POS Systems"):

> f. You will use a computer based point-of-sale system ("POS System"), including software that we specify and hardware compatible with our requirements, to record and report all sales and other designated business information to us. You agree to install any upgrade or change we require to update the POS System. Also, you will use our control systems each week to manage your business. You agree that within two (2) days after the end of the business week (currently Tuesday) you must report your gross sales and submit designated control system data to the location we designate. We may call up or poll your POS system to retrieve information at any time. If you fail to report your gross sales on time we may estimate them, charge you based on the estimate, and will adjust the estimated charges after we determine actual sales.

## FACTUAL ALLEGATIONS

### Plaintiff SULLIVAN's Experience

23.     Plaintiff is a profoundly deaf individual whose first and primary language is American Sign Language, in which he communicates fluently.

24.     On September 20, 2018, Plaintiff personally visited the Subway Restaurant located at 223 Avenue B, New York, NY 10009 with the intention of buying a steak sandwich.

25.      At that time, an employee behind the counter was in charge of taking customers' orders. Plaintiff pointed to the food on the counter and used hand gestures to indicate that he wanted a steak sandwich. The fact that Plaintiff was deaf was clearly noted by the employee.

26.     Rather than accommodate Plaintiff's disability and attempt to communicate with him, the employee became impatient and angry, using hostile hand gestures and aggressive body language when communicating with Plaintiff. Plaintiff did not understand the exact meaning of the employee's gestures.  But it was clear that he was persona non grata at Subway, and he  felt humiliated and confused.

27.    The humiliation was consummated when the Restaurant employee angrily took a sandwich and forcefully smashed it flat on the counter, making it doubly clear that Plaintiff was an unwelcome presence in the Restaurant and would not be served.

28.    Plaintiff's order was not processed, and no other Restaurant employee communicated with Plaintiff, leaving him feeling humiliated, frustrated, and helpless. Plaintiff then left the Subway Restaurant.

**The New York Defendants Violated the ADA and the New York Laws**

29.    Based on the incident described above, the New York Defendants failed to provide the same service to deaf individuals as they provide to hearing (i.e., non-deaf) individuals.

30.    The New York Defendants offered no equivalent alternative service or accessible means for Plaintiff to place an order at the Subway Restaurant.

31.    They failed to properly train their employees to not discriminate against and abuse deaf patrons and others with disabilities. As a result of this deficient training and supervision, Plaintiff suffered substantial harm through the deliberate discrimination on the basis of his disability when he was unable to access goods being sold at Subway.

32.    The New York Defendants caused Plaintiff to be denied the full and equal enjoyment of Defendant's goods, services, facilities, privileges, advantages, and/or accommodations, causing Plaintiff to suffer emotional distress, including humiliation and helplessness.

33.    The failure of the New York Defendants to provide equal access to deaf and hard-of-hearing individuals violates the mandate of the ADA to provide "full and equal enjoyment" of a public accommodation's goods, services, facilities, and privileges. Places of public

accommodation include "place[s] of exhibition and entertainment," "places[s] of recreation," and "service establishments." 28 C.F.R. § 36.201(a); 42 U.S.C. § 12181(7).

**DAL Violated the ADA and the New York Laws**

34.     While DAL is not responsible for direct day-to-day supervision of Subway employees, it is responsible for instituting a POS System that does not accommodate deaf individuals. It therefore failed to implement a readily available technology that would allow hearing impaired individuals to place orders at Subway restaurants without the assistance of restaurant employees ("Self-Ordering Terminals"), which would have prevented the frustration and humiliation described above.

35.     Below are two examples of Self-Ordering Terminals. The second allows patrons to design their own sandwiches, just as they would at Subway:



https://www.kioskmarketplace.com/articles/ufood-grills-new-self-serve-kiosk-remembers-you-for-future-visits/ (last viewed 01/28/2020)



https://moki.com/blog/customer-facing-devices-as-self-service-order-kiosks-in-restaurants/
(last viewed 01/28/2020)

36.     Self-Ordering Terminals are now widespread and cost-effective, and many restaurants have chosen to install them if only for the sake of economic efficiency.   One manufacturer of such systems, Touch Bistro, explains:

**Let Patrons Make You More Revenue**
Running a quick service restaurant isn't easy. Neither is finding ways to maximize revenue – especially as wages rise. TouchBistro's Self-Ordering Kiosk helps upsell every order at the POS by guiding guests to order and upgrade items, generating more revenue for you in the process.

With an automated Kiosk point of sale, your guests can order at their own pace and build their meals the way they want without needing to ask for help. By automatically offering them upgrades, our order Kiosk can prompt your guests with upselling opportunities they might not have known were available. Because your counter workers and servers don't need to concentrate on taking orders, they'll be free to improve the overall experience of your customers. By making ordering easier and freeing up time for employees to focus on other tasks like boosting sales, a fast food Kiosk system can improve your operations dramatically.

https://www.touchbistro.com/kiosk/ (last viewed 01/28/2020)

37.     The efficiencies of Self-Ordering Terminals have been confirmed by studies. *QSR*

*Magazine*, a trade publication for quick service restaurants like Subway, reports on one of these:

> Tillster, a global leader in digital ordering and engagement solutions for restaurant, launched its Self-Service Kiosk Index Monday. For the second consecutive year, the company partnered with research firm SSI to conduct a study on how offering self-service kiosk impacts guest behavior. The study surveyed 2,000 restaurant customers across the U.S. in an attempt to summarize customer-ordering habits with kiosks and illustrate how kiosks can lead to more visits.
>
> "Restaurants are finally beginning to adopt self-service kiosks, and our research shows it's an important offering in the customer's eyes," says Perse Faily, CEO of Tillster, in a statement. "And for restaurants, kiosks have proven to be optimized to achieve key objectives, such as increasing check size or improving speed of service."

https://www.qsrmagazine.com/technology/study-kiosk-demand-rise-quick-service  (last  viewed 01/28/2020)

38.     *Modern Restaurant Management*, another industry publication, reports on two

studies that confirm the same:

**Faster Service**

One of the most important components to providing guests with an enjoyable experience in any enterprise is speed of service. Within the airline industry, service times were reduced by 60 seconds with the incorporation of self-service kiosks. In the quick service context, Appetize data shows that implementing kiosks reduces total order time by nearly 40 percent. In this sector, total order time means from the moment a client begins the ordering process by interacting with a staff member or kiosk all the way to the moment the menu items are ready for pick-up or table delivery. In addition, a McDonald's case study found that kiosks reduce service times in fast food restaurants by nearly seven seconds, resulting in the potential market share increase of one to three percent.* Facts are facts, and they prove that self-service kiosks are reducing friction and time within the ordering process.

**Increased Order Size and Sales**

Self-service kiosks increase order sizes resulting in increased sales. Between millennials and the digital age of mobile applications, the traditional ordering experience has become outdated. When guests don't have to have one-on-one interaction, they simply feel more comfortable ordering more. In an Appetize case study measuring sales at self-service kiosks against manned cashier terminals, not only did the kiosks result in more traffic, the data showed a 21 percent increase in average order size with 1.4x more items in their cart at checkout. This all resulted in an increase of at least $5 per transaction. Sounds crazy, right? Well, we're not the only ones reporting this sort of increase. Looking back to McDonald's, self-service kiosks increased average check size by 30 percent. Still don't believe it? Taco Bell saw an increase of 20 percent when an order was made digitally instead of with a human cashier.

https://www.modernrestaurantmanagement.com/reasons-why-your-restaurant-needs-self-service-kiosks/ (last viewed 01/31/2020)

39.     Unlike many adjustments that places of public accommodation have been required to make under the ADA and the New York Laws, Self-Ordering Terminals also benefit non-disabled customers and the business itself.  Yet DAL has not yet implemented this technology. This failure is an access barrier that violates both the ADA and the New York Laws. Technological advances have made the removal of this access barriers is readily achievable[12] and not unduly burdensome.[13] As the largest international single-brand restaurant chain, it is almost trivial for DAL to remove this barrier with an appropriate POS System.[14]

40.     While Self-Ordering Terminals are not specifically mentioned in the text of the ADA, the ADA anticipates the provision of auxiliary aids and services that could not have been envisioned at the time of its enactment. The House Committee on Education and Labor stated that it intended "that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times," and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities." H.R. Rep. No. 101-485, pt. 2, at 108 (1990). The studies documenting the bottom-line financial and logistical advantages of Self-Ordering Terminals prove that these do not represent an "undue burden." Nor would Self-Ordering Terminals fundamentally alter the nature of Defendants' business.   While this

---

[12] 28 CFR 36.304.

[13] 28 CFR 36.303.

[14] "In determining whether a particular action is readily achievable or an undue burden, one must evaluate the degree to which the parent entity has resources that may be allocated to the local facility." 56 FR 7452, 7469.

technology might be out of place at certain higher-end, fine-dining restaurants, they are regularly used at, and fully appropriate to, quick service restaurants like Subway.

41.     The United States Department of Justice has specifically endorsed POS System modifications to reasonably accommodate blind individuals, and the logic is readily applicable to deaf ones:

> The fact that POS devices are not specifically addressed in the current title III regulation and the ADA Standards does not change Lucky Brand's obligations under the ADA to ensure effective communication with individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303. And when, as alleged in this case, other methods exist that would allow blind customers to independently access the debit payment option, providing them only the opportunity to complete their purchase by either divulging their PIN to a third party or paying with another payment method does not meet Lucky Brand's effective communication obligations. Mr. New has therefore alleged a valid claim of discrimination under title III of the ADA.

Statement of Interest of the United States of America, *New v. Lucky Brand Dungarees Stores, Inc*. (14-cv-20574, S.D. Fla), Dkt. No. 19, pgs. 2-3 (04/10/2014) (**Exhibit B**)

> [T]he absence of specific technical standards or regulatory provisions that directly address a public accommodation's obligation to provide accessible POS devices in no way establishes that the accessibility of POS devices is outside the scope of title III, especially where current regulations incorporate specific obligations for effective communication. See 28 C.F.R. § 36.303(a). Until the process of establishing specific technical requirements for POS devices is complete, public accommodations have a degree of flexibility in complying with title III's more general requirements of nondiscrimination and effective communication—but they still must comply. As described below, those requirements include, absent a fundamental alteration or undue burden defense, providing auxiliary aids and services in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

Id. at 8-9

42.     DAL might argue that Self-Ordering Terminals are not the only way to accommodate deaf individuals because employees can improvise ways to communicate with such individuals without the aid of special technology.  This proved to be a hollow promise in Plaintiff SULLIVAN's case given the abuse he suffered at the hands of Subway employees, as alleged above.

43.     Even setting this abuse aside, there is no reason to subject disabled individuals to the social discomfort and stigma of one-off improvisations when these can be eliminated by readily available technologies.  Self-Ordering Terminals offer efficiencies to disabled and non-disabled restaurant patrons alike.  In allowing disabled individuals to easily blend in with other restaurant patrons, they facilitate the ADA's objective of promoting their social and economic integration.  *See* Id. at 11 ("contrary to Lucky Brand's assertions …, the fact that Mr. New or other customers who are blind can complete their purchases through means other than a debit card does not support dismissal, as the ADA prohibits not only outright exclusion but also unnecessary differential treatment").

44.     *Hospitality Technology*, a trade publication for restaurants and hotels, explains why Self-Ordering Terminals accommodate the deaf and other disabled individuals in ways that ad hoc human improvisation cannot:

> Looking for a simple lunch, a deaf woman recently went into an Alabama restaurant and jotted down her order on a piece of paper. The waiter hustled the request to the kitchen, where the cooks tried to decipher the woman's handwriting. But when the sandwich was delivered, it contained tomatoes, which she had said in writing she did not want. Frustrated, the woman went back-and-forth with the waiter for a few minutes to explain exactly what she wanted. The sandwich ended up having to be remade.

> The inability of restaurants to communicate effectively with all customers both threatens to hurt their businesses and serves as an opportunity to generate additional revenue. But what might seem like an operational hurdle actually can be an easy fix with long-term financial benefits.

> Self-ordering kiosks featuring capabilities such as sign language and foreign language translations allow people with conversational difficulties to communicate more easily represent solutions that minimize order errors and strengthen the customer experience. Such technology would enable restaurants to cater to a different segment of the population – scores of people who struggle with basic communication, not only those who are deaf.

> Implementing kiosk solutions could also provide an easy avenue for ordering for those with physical impairments, brain injuries and mental disabilities. It could also benefit for those with communication problems who also suffer food allergies, to ensure their messages or

notes aren't misunderstood.

\*        \*        \*

Tailoring the units to overcome communications barriers only increases the machines' impact and value. The deaf woman at the Alabama restaurant indicated after her incorrect order that a kiosk would've prevented problems.

Realizing the need to deploy a machine that enables users of all types and capabilities to use it easily, Juke Slot is developing a patent interface that specifically provides the deaf and hard of hearing a more inviting experience. Juke Slot's ADA compliant software enables users to change the interface language to sign language, including a virtual avatar translating all customer selections in ASL. The technology could bridge a long-standing communications gap within the restaurant industry, said Jimmy Peterson, executive director of the Georgia Center of the Deaf and Hard of Hearing.

Peterson, who is deaf, has quickly become a fan of kiosks that, he said, provides convenience in ordering and confidence that his experience will be satisfactory. He recalled going to an Atlanta McDonald's last week, which didn't have kiosks. So he wrote down his order, and handed it to the person at the counter. When he received his food, the order was wrong and he was overcharged. He complained to the manager, but the manager became upset that Peterson hadn't been quick enough in placing his order and that caused issues in the fulfillment process.

"That's a pretty common mishap," Peterson said.

Kiosks with the sort of interface Juke Slot plans to implement could not only prevent mistakes, but also increase business by building relationships with new clientele, Peterson said.

"It's so easy; very easy and very efficient," Peterson said of restaurant kiosks. "If I order something, I normally write it down or text it. With the kiosk, there's a screen where I can view sign language from an avatar when ordering. I can catch what they're doing, and it means less mistakes being made when I order."

https://hospitalitytech.com/how-kiosks-could-help-deaf-foreign-language-customers-restaurants (last viewed 01/28/2020)

45.    *Modern Restaurant Management* explains that even the well-intentioned assistance of restaurant employees (which was decidedly absent in the instant action) can be socially stigmatizing to disabled individuals, who prefer that their disability not be highlighted. The chosen example is blind individuals, but the logic is equally applicable to deaf ones:

Customers with disabilities are often left out of the interactive experience due to the misconception that guests who are blind or who have low vision are more easily satisfied with the assistance of an in-person attendant. Yet this alternative does not provide an experience comparable to that of a non-visually impaired patron. Most people with

disabilities do not want to be treated any differently from anyone else, and an in-person attendant often serves as a reminder of their disability.

\*        \*        \*

By improving accessibility and usability for people who are blind or who have low vision, those in wheelchairs, or who are deaf, it improves the experience for all users. Presenting self-service kiosk content and navigation redundancies means presenting multiple ways to receive information, make selections, and interact with kiosk content. In addition to serving the disabled community, redundancies allow users to select the methods and experience that meets their preferences and can provide a better experience for users who do not read English, who are elderly, and those with temporary disabilities.

\*        \*        \*

Self-service kiosks are a perfect opportunity to improve the customer experience, increase profits, test new menu items, and optimize space. Doing so in a manner that is accessible is critical to the success of these kiosk deployments and will well-serve both the restaurant and its guests.

https://www.modernrestaurantmanagement.com/ensuring-an-accessible-kiosk-experience/
(emphasis added) (last viewed 01/28/2020)

46.     Self-Ordering Terminals give deaf individuals the very same ordering experience as non-disabled restaurant patrons, allowing them to blend in and not stand out as disabled.

**Franchisor DAL Directly Operates Its Franchisees' POS Systems**

47.     As noted above, the Doctor's Associates franchise agreement tells franchisees that they must "use a computer based point-of-sale system ("POS System"), including software that we specify and hardware compatible with our requirements, to record and report all sales and other designated business information to us."

48.     On first blush, this might seem like the minimal requirement that whatever POS software franchisees elect to use be capable of transmitting the required information to DAL, with franchisees left free to sort out other POS System specifications for themselves. Nothing could be further from the truth.  On the contrary, the factual record from 2006 onward conclusively

establishes that DAL exercises comprehensive operational control over all aspects of Subway POS Systems, including their interface with customers (or lack thereof). <u>Plaintiff could not interface with the POS System through a Self-Ordering Terminal because DAL dictated the use of a POS System that did not allow for this</u>.

    49.    In 2006, *Business Wire* reported as follows:

> ATLANTA--(<u>BUSINESS WIRE</u>)--March 9, 2006--The SUBWAY restaurant chain, the world's second largest fast-food franchise, has named NCR Corporation (NYSE:NCR) an approved point-of-sale (POS) solution provider. The <u>NCR RealPOS(TM) 70 product line will be sold to the SUBWAY chain's 24,000 worldwide franchisees exclusively through Subtotal POS Systems Ltd.</u>, a Nova Scotia-based reseller.

> Subtotal's arrangement <u>with NCR will allow the company to offer a fully integrated POS solution designed specifically for the hospitality quick-service environment</u>. The NCR RealPOS 70 is built around Intel's EmbeddedATX specification, providing a stable POS platform and extended lifecycle through the use of an industry-standard motherboard design. The 2.4 GHz Intel(R) Pentium 4 processors will be offered with a 15-inch touch screen.

> "As a POS solution provider for the SUBWAY chain, we know first hand the unique challenges this hospitality environment presents," said Daryl Fraser, Subtotal's chief executive officer and a multistore SUBWAY chain franchisee. "The NCR RealPOS 70 allows us to address these challenges and provide long-term investment protection through its simple-to-service, durable and flexible design."

> The NCR RealPOS 70 incorporates readily-accessible components that can be serviced or replaced in minutes.

> "The NCR RealPOS 70 is used by restaurant operators worldwide, and backed by more than 100 years of hospitality experience," said NCR Vice President of Hospitality Sales Tracy Flynn. <u>"We believe that this proven solution--combined with Subtotal's training, intimate knowledge of the SUBWAY business model, and hardware and software support--will make a measurable impact on business efficiency and customer service for SUBWAY brand franchisees."</u>

https://www.businesswire.com/news/home/20060309005487/en/NCR-Subtotal-Offer-Approved-SUBWAY-Restaurant-Chain (emphasis added) (last viewed 01/28/2020)

    50.    As the highlighted language reveals, DAS comprehensively dictates the specific POS System to be used all Subway franchises, a POS System that has been built to its specifications, including its notions of business efficiency and proper customer service. DAL's

dictates are <u>not</u> limited to the minimum requirement that POS Systems be capable of transmitting sales data or other pertinent information to DAL.

51.    This is further confirmed by Aimee Bradshaw writing in *Expert Market* in 2007:

Their point of sale (POS) system is custom made, specifically designed for their needs by Scoresby Interactive.

Subway's aim when creating their POS system was simplicity of use. This was in order to reduce training time. They also wanted a system to prevent employee theft. The full list of their requests and goals can be seen below:

- Reduce the amount of time needed to train new staff
- Minimize the risk of employee theft
- Increase the speed of service
- Improve order accuracy

**<u>Results</u>**

Subway's new POS system built by Scoresby Interactive specifically for their needs has helped the company reach these goals.

<u>The system turned out to be so effective that staff found they could engage more with their customers whilst using it.</u>

It's so easy to use that most store managers no longer need to offer new members of staff formal training. Now they just give a simple orientation to each new employee at the start of their first shift.

https://www.expertmarket.com/pos/subway-pos-system   (emphasis   added)   (last   viewed 01/28/2020)

52.    As the article makes clear, the POS System being distributed at the time was designed with an eye for customer engagement. It was designed for customers who could readily engage with store employees, not for those, like Plaintiff, who could not.  DAL's POS System specifications go far beyond the minimum requirement stressed in the franchise agreement. Since DAL dictates the nature of its custom-designed software, it also distracts the hardware that is compatible with it—and therefore the POS System as a whole.

53.    In 2009, *Computer Weekly* reported that "[t]he Subway sandwich chain is implementing a new point of sale system across 30,000 outlets worldwide to increase efficiency." Subway CTO Thys Van Hout was quoted as saying, "We understood that this evaluation process

was going to result in the largest global deployment of a commercially available solution in the

QSR (quick service restaurant) market. We spent over 11 months evaluating over 25 vendors."[15]

54.     Also in 2009, *QSR Magazine* reported

**Subway Chooses ParTech POS System**

ParTech Inc., a provider of software and hardware solutions to restaurants, hotels, spas, and retail industries, today announced that the <u>SUBWAY restaurant chain has selected PAR as their supplier of in-store hardware point-of-sale (POS) terminals.</u> In addition, Subway restaurants will utilize PAR's global capabilities and infrastructure during their new world-wide technology implementation for deployment and lifecycle support services. ParTech Inc. is a wholly owned subsidiary of PAR Technology Corporation (NYSE- PTC).

After a thorough evaluation period, Subway selected PAR's EverServ POS hardware solution for their next generation in-store hardware platform over several other vendors. <u>PAR's design combines flexibility, scalability, and durability in a smart compact point-of-sale terminal.</u> This hardware offering provides peak performance with powerful processors for improved graphics and increased speed of service. By design, PAR's hardware solutions contain energy-saving features and rugged architecture that highlight a low total cost of ownership and long product lifespan. <u>PAR worked very closely with the Subway technology team to ensure that all of the brand's technology requirements were met and exceeded.</u>

"During our detailed evaluation and selection process, PAR exceeded our rigorous requirements through their POS technology expertise and experience," says Thys Van Hout, Subway's chief technology officer. <u>"PAR's open, flexible technology and robust functionality makes it easier to integrate within our restaurants in a way that is seamless to our in-store operations."</u>

https://www.qsrmagazine.com/news/subway-chooses-partech-pos-system   (emphasis   added)   (last viewed 01/28/2020)

55.     Again, it is clear that DAL does not simply dictate certain minimal software

specifications, but also chooses the POS terminal itself—a "smart compact point-of-sale

terminal." Unfortunately, DAL's chosen terminal was too compact to provide Plaintiff with the

auxiliary aid he required to effectively communicate his order. The terminal was designed with

---

[15] https://www.computerweekly.com/news/2240088023/Subway-deploys-new-POS-across-30000-outlets

an eye for "in-store operations," not just the transmission of sales data to DAL.

56.     In the same vein, *QSR Web* reported in 2009 that the EverSer POS is a "next generation in-store hardware platform" and that "PAR worked closely with the Subway technology team to ensure that all of the brand's technology requirements were met and exceeded."[16]

57.     The same comprehensive operational control of its POS systems has persisted into the present day with DAL's latest procurement from Sintel Systems.  On February 2, 2017, Sintel Systems announced that it "provides restaurants like Subway to run a successful business with point of sale software and hardware systems." Sintel Systems does not simply enable a range of different POS Systems to communicate franchisee information to franchisors. Rather, Sintel Systems is a "single source for business solutions" whose "experienced, knowledgeable team negotiates the complex POS landscape for you to enable you to find the right POS system for your business and budget."[17]

58.     Sintel Systems further explains that:

Keeping up with a fast-paced restaurant and meeting customer demands is essential for success. With Sintel Systems Restaurant Software, transactions are processed quickly and accurately. Our fully customizable and categorized menu options make the software adaptable and efficient. Add modifier items, daily features, and lunch/dinner specials with no problem. Using Sintel Restaurant Software will improve customer service and help make managing your restaurant easier than ever.

Sintel Systems restaurant point of sale software caters to all types of restaurants ranging from QSRs (quick service restaurants) to full service eateries and catering operations. Our professional restaurant POS software is designed to help efficiently you run your store and provide great customer service at the same time. Equipped with the ability to easily implement your menu and an adaptable interface, ringing customers orders has never been faster or easier. The user friendly front-end of the allows for quick employee training while the backend offers an extensive menu of management tools including sales reports, employee hour management, processing transactions, and taking inventory of items. With less time working on managerial duties you will have the time to be able to provide your

---

[16] https://www.qsrweb.com/news/subway-selects-partech-pos-solution/
[17] https://www.sintelsystems.com/blog/2017/02/02/subway-restaurant-success/

patrons with an environment they will want to come back to. In such a highly competitive
market it is crucial to <u>maintain quality customer service</u>. Running your business has never
been more effortless with Sintel Systems professional grade restaurant POS software.

https://www.sintelsystems.com/our-software/restaurant-point-of-sale-pos-software/restaurant-software-pos#collateral-tabs (emphasis added) (last viewed 01/28/2020)

59.     While the franchise agreement stresses certain "backend" features of the POS
Systems franchisees will be required to use, the above makes clear that these systems dictate the
"front-end" as well, which encompasses employee-patron interaction. As with the EverSer POS
ordered in 2009, the Sintel Systems POS System is designed with an eye for what DAL deems to
be its comprehensive needs, to reflect its notion of "quality customer service."  Sintel Systems
provides what it describes as an "adaptable interface," but that interface was not adaptable enough
to reasonably accommodate deaf patrons like Plaintiff, and it was DAL, not individual
franchisees, that choose to implement it.

60.     Below are reproductions of the Sintel System interface, which interface only with
employees and do not allow customers to order for themselves:



https://www.sintelsystems.com/point-of-sale/food-service (last viewed 01/28/2020)

61.     In short, the reason the New York Defendants and other Subway franchisees could not reasonably accommodate disabled individuals through Self-Ordering Terminals is that Doctor's Associates decreed this.

## CLASS ALLEGATIONS

62.     Plaintiff brings this class action on behalf of himself and all others similarly situated pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all people with hearing disabilities who have attempted, or will attempt, to access Defendants' Subway restaurants.

63.     **Numerosity**: The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective class members through this class action will benefit both the parties and this Court.

64.     **Typicality:** Plaintiff's claims are typical of the claims of the members of the class. The claims of Plaintiff and the members of the class are based on the same legal theories and arise from the same unlawful conduct.

65.     **Common Questions of Fact and Law:** There is a well-defined community of interest and common questions of fact and law affecting members of the class in that they all have been and/or are being denied their civil rights to full and equal access to, and use and enjoyment of, Defendants' Facilities and/or services due to Defendants' failure to make their facilities fully accessible and independently usable as above described.

66.     **Adequacy of Representation:** Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the members of the class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the class and have no interests antagonistic to the members of the class. Plaintiff has retained counsel who

are competent and experienced in the prosecution of class action litigation, generally, and who possess specific expertise in the context of class litigation under the ADA.

67.    **Predominance:** Common issues of law and fact predominate over individual ones. While not every deaf Subway patron was treated as rudely as Plaintiff SULLIVAN, all were subject to unnecessary differential treatment that highlighted, and thus stigmatized them for, their disabilities.

68.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the Class as a whole.

## ACCESS BARRIERS TO PLAINTIFF AND THE CLASS CANNOT BE REMOVED WITHOUT INJUNCTIVE RELIEF AGAINST DAL AND THE NEW YORK DEFENDANTS

69.    As a result of DAL's non-compliance with the ADA, Plaintiff and members of the proposed class's ability to access and use Defendants' Restaurant has been significantly impeded.

70.    DAL must anticipate encountering customers with hearing impairment in all of its restaurants. It should be compelled to implement some form of Self-Ordering Terminal at all Subway restaurants to make them accessible to the deaf and hard of hearing.

71.    DAL has never had an effective nationwide policy that is reasonably calculated to make its Subway restaurants fully accessible to, and independently usable by, individuals with hearing disabilities.

72.    As an individual with a hearing disability who is dependent upon written replacements for oral announcements, Plaintiff has a keen interest in whether public accommodations have barriers that impede full accessibility to those accommodations by individuals with hearing impairments.

73.     Plaintiff intends to continue to visit the Restaurant as well as other Subway locations.

74.     Furthermore, Plaintiff intends to return to Defendants' restaurants to ascertain whether they remain in violation of the ADA. However, so long as the numerous barriers at Defendants' restaurants continue to exist, Plaintiff will be deterred from returning to them.

75.     Without injunctive relief, Plaintiff and members of the proposed class will continue to be unable to fully access Subway restaurants in violation of their rights under the ADA.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of Americans with Disabilities Act**
*42 U.S.C. § 12181, et seq.*
*(on behalf of Plaintiff and the Class)*

76.     Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully herein.

77.     Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12182(a), provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." Title III also prohibits an entity from "[u]tilizing standards or criteria or methods of administration that have the effect of discriminating on the basis of disability." 42 U.S.C. § 12181(b)(2)(D)(I).

78.     Title III of the ADA further provides that "[i]t shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or

class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

79.    Title III of the ADA further defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

80.    Title III of the ADA further defines discrimination to include "a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities . . . where such removal is readily achievable," or "where an entity can demonstrate that the removal of a barrier . . . is not readily achievable a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable."42 U.S.C. § 12182(b)(2)(A)(iv – v).

81.    Defendants operate a place of public accommodation as defined by Title III of ADA, 42 U.S.C. § 12181(7).

82.     Under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(I) it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

83.     Specifically, under Title III of the ADA, 42 U.S.C. § 12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities,

unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

84.     The acts alleged herein constitute violations of Title III of the ADA, 42 U.S.C. § 12101 *et seq.,* and the regulations promulgated thereunder. Individuals who are deaf and hard-of-hearing have not been provided services that are provided to other patrons who are not disabled, and/or have been provided services that are inferior to the services provided to non-disabled patrons.

85.     Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

86.     Modifying its policies, practices, and services to make its service accessible to deaf and hard-of-hearing individuals would not fundamentally alter the nature of Defendants' business, nor would it pose an undue burden to this flourishing company.

87.     Defendants discriminate and will continue to discriminate against Plaintiff and members of the proposed class on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of its restaurants in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.* and/or its implementing regulations.

88.     Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff and members of the proposed class will continue to suffer irreparable harm. Plaintiff intends to return to the Subway Restaurant in the future once the service is available.

89.     The actions of Defendants were and are in violation of the ADA and therefore Plaintiff invokes his statutory right to injunctive relief to remedy the discrimination.

90.     Plaintiff seeks an injunction requiring Defendants to remove all access barriers so

their facilities are fully accessible to, and independently usable by, individuals with hearing disabilities, as required by the ADA. Plaintiff further requests that, given Defendants' historical failure to comply with the ADA's mandate over a period of many years,[19] the Court retain jurisdiction of this matter for a period to be determined to ensure that Defendants come into compliance with the relevant requirements of the ADA. The Court's oversight would not be complex as the implementation could be reasonably achieved through simple steps. The New York Defendants need only implement adequate supervision and training of employees. DAL need only install Self-Ordering Terminals throughout all Subway restaurants in the United States.

91.     Plaintiff is also entitled to reasonable attorneys' fees and costs.

92.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

**Violation of New York State Human Rights Law,**
N.Y. Exec. Law, Article 15 (Executive Law § 292 *et seq.*)
(on behalf of Plaintiff and New York State subclass)

93.     Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth herein.

94.     N.Y. Exec. Law § 296(2)(a) provides that it is "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee

---

[19] DAL was subject to an investigation and compliance review by the United States of America ("the United States") regarding allegations that certain Subway restaurants were not accessible to individuals with disabilities in violation of the ADA, and a settlement was reached between the United States and Defendant Doctor's Associates in 2007. *See* Settlement Agreement Between The United States Of America, And Doctor's Associates Inc. And Subway Real Estate Corp., https://www.ada.gov/subwayrest.htm (last accessed May 29, 2019).

of any place of public accommodation . . . because of the . . . disability of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

95.     Defendant Manchanda operates a place of public accommodation as defined by N.Y. Exec. Law § 292(9).

96.     Defendants are subject to New York Human Rights Law because they own, license, and/or operate the Subway Restaurant. Defendants are persons within the meaning of N.Y. Exec. Law § 292(1).

97.     Defendants are violating N.Y. Exec. Law § 296(2)(a) in failing to provide deaf and hard-of-hearing patrons full and equal access to the facilities, goods, and services that Defendants make available to the non-disabled public.

98.     Specifically, under N.Y. Exec. Law § 296(2)(c)(I), unlawful discriminatory practice includes, among other things, "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations."

99.     In addition, under N.Y. Exec. Law § 296(2)(c)(II), unlawful discriminatory practice also includes, "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden."

100.    Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing. Plaintiff intends to return to the Subway Restaurant in the future once the discriminatory conduct is remediated.

101.    Defendants discriminate and will continue to discriminate against Plaintiff and members of the proposed New York State subclass on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations, and/or opportunities of its restaurants under § 296(2) *et seq.* and/or its implementing regulations. Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff and members of the proposed New York State subclass will continue to suffer irreparable harm.

102.    The actions of Defendants were and are in violation of New York State Human Rights Law and therefore Plaintiff invokes his right to injunctive relief to remedy the discrimination.

103.    Defendants have further violated the New York State Human Rights Law by being in violation of the rights provided under the ADA.

104.     Plaintiff is also entitled to compensatory damages, as well as civil penalties and fines pursuant to N.Y. Exc. Law § 297(4)(c) *et seq.* for each and every offense.

105.    Plaintiff is also entitled to reasonable attorneys' fees and costs.

106.    Pursuant to N.Y. Exec. Law § 297 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

## **THIRD CAUSE OF ACTION**

### **Violation of New York State Civil Rights Law**
NY CLS Civ R, Article 4 (CLS Civ R § 40 et seq.)
(on behalf of Plaintiff and New York State subclass)

107.  Plaintiff served notice thereof upon the attorney general as required by N.Y. Civil Rights Law § 53.

108.  Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth herein.

109.  N.Y. Civil Rights Law § 40 provides that "all persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodations, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons. No persons, being the owner, lessee, proprietor, manager, superintendent, agent, or employee of any such place shall directly or indirectly refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities and privileges thereof . . ."

110.  N.Y. Civil Rights Law § 40-c(2) provides that "no person because of . . . disability, as such term is defined in section two hundred ninety-two of executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision."

111.  Defendants own and/or operate the Subway Restaurant, which is a public accommodation within the definition of N.Y. Civil Rights Law § 40-c(2).

112.  Defendants are subject to New York Civil Rights Law because it owns and operates the Restaurant. Defendants are a person within the meaning of N.Y. Civil Law § 40-c(2).

113.    Defendants are violating N.Y. Civil Rights Law § 40-c(2) in denying deaf and hard-of-hearing patrons full and equal access to the goods and services that Defendants make available to the non-disabled public.

114.    In addition, N.Y. Civil Rights Law § 41 states that "any corporation which shall violate any of the provisions of sections forty, forty-a, forty-b or forty-two . . . shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby . . . "

115.    Specifically, under N.Y. Civil Rights Law § 40-d, "any person who shall violate any of the provisions of the foregoing section, or subdivision three of section 240.30 or section 240.31 of the penal law, or who shall aid or incite the violation of any of said provisions shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby in any court of competent jurisdiction in the county in which the defendant shall reside . . . "

116.    Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

117.    As such, Defendants discriminate, and will continue in the future to discriminate against Plaintiff and members of the New York State subclass on the basis of disability. Plaintiff and members of the New York State subclass was refused, withheld from, or denied the accommodations, advantages, facilities and privileges thereof in § 40 *et seq.* and/or its implementing regulations.

118.    Plaintiff and New York Subclass members are entitled to compensatory damages of five hundred dollars per instance, as well as civil penalties and fines pursuant to N.Y. Civil Law § 40 *et seq.* for each and every offense.

## FOURTH CAUSE OF ACTION

**Violation of New York City Human Rights Law, N.Y.C. Administrative Code § 8-102, et seq.**
(on behalf of Plaintiff and New York City subclass)

119.   Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully herein.

120.   N.Y.C. Administrative Code § 8-107(4)(a) provides that "It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation . . . [b]ecause of any person's . . . disability . . . directly or indirectly . . . [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation."

121.   Defendants own, license, and/or operate the Subway Restaurant, which is a public accommodation within the definition of N.Y.C. Administrative Code § 8-102.

122.   Defendants are subject to City Law because it owns and operates the Subway Restaurant. Defendants are a person within the meaning of N.Y.C. Administrative Code § 8-102.

123.   Defendants are violating N.Y.C. Administrative Code § 8-107(4)(a) in denying deaf and hard-of-hearing patrons full and equal access to the facilities, goods, and services that Defendants make available to the non-disabled public. Specifically, Defendants are required to "make reasonable accommodation to the needs of persons with disabilities . . . it is an unlawful discriminatory practice for any person prohibited by the provisions of [§ 8-107 *et seq.*] from discriminating on the basis of disability not to provide a reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is

known or should have been known by the covered entity." N.Y.C. Administrative Code § 8-107(15)(a).

124.   Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

125.   Defendants discriminate and will continue to discriminate against Plaintiff and members of the proposed New York City subclass on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of its restaurants under § 8-107(4)(a) and/or its implementing regulations. Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff and members of the proposed New York City subclass will continue to suffer irreparable harm.

126.   The actions of Defendants were and are in violation of City law and therefore Plaintiff invokes his right to injunctive relief to remedy the discrimination.

127.   Plaintiff is also entitled to compensatory damages, as well as civil penalties and fines under N.Y.C. Administrative Code § 8-120(8) and § 8-126(a) for each offense.

128.   Plaintiff is also entitled to reasonable attorneys' fees and costs.

129.   Pursuant to N.Y.C. Administrative Code § 8-120 and § 8-126 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

### FIFTH CAUSE OF ACTION

**Declaratory Relief**
(on behalf of Plaintiff and the Class)

130.   Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully herein.

131.   An actual controversy has arisen and now exists between the parties in that

Plaintiff contends, and believes that Defendants deny, that the Restaurant denied deaf and hard-of-hearing individuals the full and equal access to the goods and services, which Defendants own, operate, and/or control, fails to comply with applicable laws including, but not limited to, Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.*, N.Y. Exec. Law § 296, *et seq.,* and N.Y.C. Administrative Code § 8-107, *et seq.* prohibiting discrimination against the deaf and hard of hearing.

132.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

133.    A preliminary and permanent injunction to prohibit Defendants from violating the Americans with Disabilities Act, 42 U.S.C. § 12182, *et seq.,* N.Y. Exec. Law § 296, *et seq.,* N.Y.C. Administrative Code § 8-107, *et seq.*, and the laws of New York;

134.    A preliminary and permanent injunction requiring Defendants to take all the steps necessary to make the Restaurant into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that the Restaurant is readily accessible to and usable by deaf individuals;

135.    A declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants have subjected Plaintiff to unlawful discrimination in violation of Title III of the Americans with Disabilities Act, the New York State Human Rights Law, and the City Law;

136.    An order certifying this case as a class action under Fed. R. Civ. P. 23(a) & (b)(2)

and/or (b)(3), appointing Plaintiff as Class Representative, and his attorneys as Class Counsel;

137.   An Order compelling DAL to install Self-Ordering Terminals at all franchise locations across the United States.

138.   An Order compelling the New York Defendants:

      i.   to train all of their employees and staff on a regular (at least annual) basis about the rights of individuals who are deaf or hard of hearing, and to enforce a policy and training process which includes anti-discrimination and anti-harassment against customers with disabilities, and prohibits future discrimination against Plaintiff and other deaf or hard-of-hearing individuals by educating their employees about the communication needs of deaf and hard-of-hearing individuals and promotes a culture of providing all customers, disabled and non-disabled alike, with equal respect and service; and

      i.   to consider the communication needs of deaf individuals who seek their goods and/or services and affirmatively work with deaf individuals to provide effective auxiliary aids and services to make their restaurant accessible.

139.   Compensatory damages in an amount to be determined by proof, including all applicable statutory damages and fines, to Plaintiff and the New York and City subclasses for violations of their civil rights under the appropriate New York Laws;

140.   Plaintiff's reasonable attorneys' fees, statutory damages, expenses, and costs of suit as provided by state and federal law;

141.   For pre- and post-judgment interest to the extent permitted by law; and

142.   Such other relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

DATED: January 31, 2020                                LEE LITIGATION GROUP, PLLC

                                                       By: */s/ C.K. Lee*_____
                                                           C.K. Lee, Esq.

                                                       C.K. Lee (CL 4086)
                                                       Anne Seelig (AS 3976)
                                                       148 West 24th Street, Eighth Floor
                                                       New York, NY 10011
                                                       Tel.: 212-465-1188
                                                       Fax: 212-465-1181