**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
PHILLIP SULLIVAN, JR.,                                   :
                                                         :
                          Plaintiff,                     :
                                                         :         Case No. 1:19-cv-00719 (GHW)
                                                         :
                                                         :
               - against -                               :
                                                         :
DOCTOR'S ASSOCIATES LLC,                                 :
GEETA FASTFOOD ENTERPRISE INC.,                          :
and ABHIMANUE MANCHANDA,                                 :
                          Defendants.                    :
-------------------------------------------------------- x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
DOCTOR'S ASSOCIATES LLC'S MOTION TO DISMISS PLAINTIFF'S SECOND
AMENDED CLASS ACTION COMPLAINT**


**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES …………………………………………………………..ii

INTRODUCTION……………………………………………………………………1

STANDARD OF REVIEW …………………………………………………………3

ARGUMENT………………………………………………………………………...4

    I.    DAL OPERATES FRANCHISEE RESTAURANTS WITH RESPECT
         TO THEIR POINT OF SALE SYSTEMS………………………………………4

    II.   SELF-ORDER KIOSKS ARE NECESSARY FOR EFFECTIVE
         COMMUNICATION BETWEEN DEAF CUSTOMERS AND
         SUBWAY EMPLOYEES ……………………………………………………9

CONCLUSION ………………………………………………………………………18

## TABLE OF AUTHORITIES

**Cases**

*Argenyi v. Creighton Univ.*,
 703 F.3d 441 (8th Cir. 2013) ............................................................................. 10

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ............................................................................................ 4

*Baughman v. Walt Disney World Co.*,
 685 F.3d 1131 (9th Cir. 2012) ............................................................. 13, 14, 16

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................... 4, 5, 8

*Camarillo v. Carrols Corp.*,
 518 F.3d 153 (2d Cir. 2008) .................................................................. 3, 10, 17

*Dicarlo v. Walgreens Boot All., Inc.*,
 2016 WL 482982 (S.D.N.Y. Feb. 5, 2016) ....................................................... 11

*Fortyune v. American Multi-Cinema, Inc.*,
 364 F.3d 1075 (9th Cir. 2004) .......................................................................... 14

*Gregory v. Daly*,
 243 F.3d 687 (2d Cir. 2001) ............................................................................. 13

*In re Facebook, Inc.*,
 986 F. Supp. 2d 487 (S.D.N.Y. 2013) ................................................................ 4

*In re Nat. Gas Commodity Litig.*,
 337 F. Supp. 2d 498 (S.D.N.Y. 2004) ................................................................ 4

*Innes v Bd. of Regents of the Univ. Sys. of Maryland*,
 29 F Supp 3d 566 (D. Md. 2014) ................................................................ 15, 17

*Jander v. Int'l Bus. Machines Corp.*,
 205 F. Supp. 3d 538 (S.D.N.Y. 2016) ................................................................ 4

*Jeffrey Farkas M.D., LLC v. Grp. Health, Inc.*,
 2019 U.S. Dist. LEXIS 17756 (S.D.N.Y. Feb. 1, 2019) ..................................... 4

*Johnson v. Winchester Campbell Props., LLC*,
 18-cv-04153, 2018 U.S. Dist. LEXIS 213064 (N.D. Cal. Dec. 18, 2018) .......... 9

*Krimstock v. Kelly*,
 306 F.3d 40 (2d Cir. 2002) ................................................................................. 4

*N.A. of the Deaf v Harvard Univ.*,
 No. 3:15-cv-30023, 2016 US Dist LEXIS 120121 (D. Mass Feb. 9, 2016) ....... 17

*Nat'l Fed'n of the Blind v. Target Corp.*,
  452 F. Supp. 2d 946 (N.D. Cal. 2006) .................................................................. 17

*Neff v. American Dairy Queen Corp.*,
  58 F.3d 1063 (5th Cir. 1995) .......................................................................... 8, 9

*New v. Lucky Brand Dungarees Stores, Inc.*
  (14-cv-20574, S.D. Fla.), Dkt. No. 19 ................................................................. 14

*Noll v. IBM*,
  787 F.3d 89 (2d Cir. 2015) ............................................................................. 17

*Oliver v. Rio Acquisition Partners, LLC*,
  2019 WL 801952 (S.D.N.Y. Feb. 21, 2019) ............................................................. 9

*West v. Five Guys Enterprises, LLC*,
  2016 WL 482981 (S.D.N.Y. Feb. 5, 2016) ............................................................. 10

*West v. Moe's Franchisor, LLC*,
  15-cv-2846, 2015 U.S. Dist. LEXIS 165070 (S.D.N.Y. Dec. 9, 2015) ................................... 11

**Statutes**

42 U.S.C. §12182(a) ....................................................................................... 2

42 U.S.C. §12182(b)(2)(A)(ii)-(iii) ....................................................................... 2

CLS Civ R §40-c(2) ......................................................................................... 2

N.Y. Exec. Law § 296(2)(c)(II) ............................................................................ 2

N.Y. Exec. Law §296(2)(a) ................................................................................. 2

N.Y. Exec. Law §296(2)(c)(I) .............................................................................. 2

N.Y.C. Admin. Code § 8-107(15)(a) ........................................................................ 2

N.Y.C. Admin. Code § 8-107(4)(a) ......................................................................... 2

**Other Authorities**

H.R. Rep. No. 101-485, pt. 2, at 108 (1990) .............................................................. 16

U.S. Dep't of Justice, The Americans with Disabilities Act Title II Technical Assistance Manual,
  at II-7.1100 (1993) ..................................................................................... 10

**Regulations**

28 C.F.R. § 36.303(c)(1)(ii) .............................................................................. 12

## INTRODUCTION

This case arises out of Defendant's policy and practice of denying deaf and hard-of-hearing individuals throughout the United States with equal access to the goods and services they provide to non-disabled individuals through its failure to install the self-order kiosks absent which such access is impossible. *See* Second Amended Complaint ("SAC") ¶¶ 34-46. On September 20, 2018, Plaintiff Sullivan ("Plaintiff" or "Plaintiff Sullivan") is a deaf individual who personally visited a Subway Restaurant located at 223 Avenue B, New York, NY 10009. *See* SAC ¶ 24. Plaintiff attempted to order a steak sandwich by pointing to the food on the counter and using hand gestures to indicate his desire for a steak sandwich. However, restaurant staff mockingly responded with angry hand gestures and aggressive body language and then forcefully smashed the sandwich flat on the counter, communicating to Plaintiff in unambiguous terms that he was persona non grata at Subway. Plaintiff's order was not processed, and no other restaurant employee communicated with Plaintiff, leaving him feeling humiliated, frustrated, and helpless. *See* SAC ¶¶ 25-28. This experience was the outcome of structural problems that are always present for the deaf and hard of hearing at Subway restaurants, where the communication challenges of making customized orders leave employees impatient and aggravated, a situation that then culminates in the abuse Plaintiff suffered. This abuse was not a random one-off event, but the product of circumstances that only self-order kiosks can remedy.

Defendant Doctor's Associates Limited ("Defendant" or "DAL") is the franchisor of Subway restaurants, an international chain of quick service restaurants specializing in subway sandwiches. In failing to install self-order kiosks, DAL violated Title III of the Americans with Disabilities Act ("ADA") and analogous New York statutes ("New York Laws") protecting the disabled. The ADA and the New York Laws prohibit as unlawful discrimination any practice or

policy that deprives disabled individuals of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations that the relevant entity affords non-disabled individuals. *See* 42 U.S.C. §12182(a), N.Y. Exec. Law §296(2)(a); CLS Civ R §40-c(2); N.Y.C. Admin. Code § 8-107(4)(a).

Unlawful discrimination includes the failure to provide the hearing impaired with auxiliary aids and services that they require to fully access and meaningfully avail oneself of an entity's programs, benefits, or services.  The ADA and the New York Laws create liability when an entity "fail[s] to make reasonable modifications in policies, practices, or procedures… when such modifications are necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations…or result in an undue burden." 42 U.S.C. §12182(b)(2)(A)(ii)-(iii); *see also* N.Y. Exec. Law §296(2)(c)(I); N.Y. Exec. Law § 296(2)(c)(II); N.Y.C. Admin. Code § 8-107(15)(a). Compliance with the ADA requires an entity "to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services…" 42 U.S.C. § 12182(b)(2)(A)(iii).

Defendant's motion to dismiss the SAC ("Def. Mot.") rests on two principal arguments. First, DAL argues that as the franchisor of Subway restaurants, it is not their "operator" with respect to the access barrier that prevents deaf and hard of hearing customers like Plaintiff from fully and equally enjoying the benefits and services of Subway restaurants.  Citing the Court's January 17, 2020 Memorandum and Order (ECF #54) (the "Order"), DAL stresses that that Section 5(f) of its

2

Franchise Agreement with franchisee stores fails to establish that it exercises operational control over their point of sale systems ("POS Systems"). Defendant claims that it has no say as to whether its franchisees do or do not employ self-order kiosks. Accordingly, it is not liable for the access barrier detailed in the SAC. *See* Def. Mot. at 6-10. Second, Defendant argues that self-order kiosks are not required to comply with the ADA, since store employees can alternatively communicated with deaf customers through written notes and hand signals. *See* Def. Mot. at 10-11.

Both Defendant's arguments fail. Its contention that it is not an operator of Subway restaurants brazenly ignores that the SAC's allegations do not depend on the wording of its Franchise Agreement. Plaintiff has adduced ample external evidence that DAL exercises and always has exercised complete operational control over franchisee POS Systems, making it impossible for individual franchisees to individually install self-ordering kiosks. The four corners of the Franchise Agreement may not formally prohibit self-order kiosks, but the realities of DAL's actual practices mean that the decision is DAL's, not franchisees'. DAL's argument that self-order kiosks are not necessary to comply with the ADA ignores Plaintiff's evidence that the one-off human improvisation DAL recommends cannot facilitate the effective communication mandated by the ADA. More fundamentally, it also ignores that this determination presents a factual question that cannot be appropriately decided on a motion to dismiss.

## STANDARD OF REVIEW

"To state a claim under Title III, [a plaintiff] must allege (1) that [they are] disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against [the plaintiff] by denying [] a full and equal opportunity to enjoy the services defendants provide." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008).

3

"A complaint will survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) as long as it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its own face.'" *Jeffrey Farkas M.D., LLC v. Grp. Health, Inc.*, 2019 U.S. Dist. LEXIS 17756, at 8 (S.D.N.Y. Feb. 1, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Courts 'accept as true all well-pleaded factual allegations.'" *Id.* (quoting *Jander v. Int'l Bus. Machines Corp.*, 205 F. Supp. 3d 538, 541 (S.D.N.Y. 2016)). "This is not intended to be an onerous burden, as plaintiffs need only allege facts sufficient in order to "nudge[] their claims across the line from conceivable to plausible." *In re Facebook, Inc.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The Court may grant a motion to dismiss under Rule 12(b)(6) only if 'it appears beyond doubt that the plaintiffs can prove no set of facts in support of his claim which would entitle him to relief.'" *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) (quoting *Krimstock v. Kelly*, 306 F.3d 40, 48 (2d Cir. 2002)).

## ARGUMENT

### I.   DAL OPERATES FRANCHISEE RESTAURANTS WITH RESPECT TO THEIR POINT OF SALE SYSTEMS

DAL accuses Plaintiff of "ignoring" the Court's ruling dismissing the First Amended Complaint, where the Court found, as DAL puts it, that Section 5(f) of the Subway Franchise Agreement addressing point of sale equipment was "not a basis for plausibly alleging that DAL controlled what technological assistance devices were or were not present in the Franchisee's restaurant." Def. Mem. at 5. This is not a serious argument given that the SAC fully and unambiguously remedies the precise deficiency highlighted by the Court Order. The Order states in pertinent part:

> [T]he provision in the Franchise Agreement specifying that employees must use a "computer based point-of-sale ('POS System'), including software that [DAL] specif[ies]

4

and hardware compatible with [DAL's] requirements" does not enable Plaintiff to plausibly allege that DAL is an operator with respect to the Restaurant's accessibility to the disabled. Franchise Agreement at 6, § 5(f). This provision is directed toward controlling back-end communications between DAL and franchisees. See id. (requiring franchisees to use specific software and hardware "to record and report all sales and other designated business information to us"). Plaintiff's allegations pertain to communications between Restaurant employees and customers, not communications between franchisees and DAL. Thus, these allegations are insufficient to plead that DAL specifically controls the Restaurant's accessibility to the disabled. Accordingly, because Plaintiff has failed to plausibly allege that DAL is an operator of the Restaurant, Plaintiff's ADA claims are dismissed.

Order at 12-13

The SAC responds to this judgment by alleging that while the four corners of Section 5(f) may encourage the erroneous impression that DAL merely dictates certain minimal requirements for its franchisees' POS Systems—that they be capable of communicating "designated business information" to DAL—the reality is otherwise. DAL's control over Subway POS Systems extends well beyond "communications between franchisees and DAL" and reaches "communications between Restaurant employees and customers," the subject of Plaintiff's allegations, because DAL dictates all facets of its franchisees' POS Systems. The SAC provides this allegation with "further factual enhancement" through a bevy of industry publications all attesting to the fact that DAL cooperates with various vendors to design the entirety of the POS Systems used at all its franchise locations. *Twombly*, 550 U.S. at 557. *See* SAC ¶¶ 47-61. These articles, whose accuracy DAL does not dispute, make abundantly clear that DAL's operational control over franchisees' POS Systems is comprehensive and not limited to "communications between franchisees and DAL." On the contrary, considerations pertaining to employee-customer interaction permeate the POS System design process that DAL directs. Citing the Court, DAL observes that "a franchisor is only an 'operator' if it 'specifically controls' its franchisee with respect to the allegedly discriminatory conditions." (quoting Order at 10). And this is precisely what the new allegations in the SAC establish beyond question.

5

DAL does not merely approve certain POS Systems and withhold approval from others. Rather, it dictates which POS System franchisees will purchase and employ. For example, *Business Wire* reported the NCR Corporation's "RealPOS(TM) 70" POS system "will be sold to the SUBWAY chain's 24,000 worldwide franchisees." SAC ¶ 49. *Computer Weekly* reported that "[t]he Subway sandwich chain is implementing a new point of sale system across 30,000 outlets worldwide to increase efficiency**.**" It quotes Subway CTO Thys Van Hout saying, "We understood that this evaluation process was going to result in the largest global deployment of a commercially available solution in the QSR (quick service restaurant) market." SAC ¶ 53. Not only does DAL dictate which POS systems its franchisees will employ, it is intimately involved in the *design* of those systems. Aimee Bradshaw writing in *Expert Market* noted that "Subway's aim when creating their POS system was simplicity of use" and that "Subway's new POS system [was] built by Scoresby Interactive specifically for their needs." SAC ¶ 51. In the same vein, *QSR Magazine* reported that the PAR Technology Corporation "worked very closely with the Subway technology team to ensure that all of the brand's technology requirements were met and exceeded." Thys Van Hout, Subway's chief technology officer, is quoted as explaining that "PAR's open, flexible technology and robust functionality makes it easier to integrate within our restaurants in a way that is seamless to our in-store operations." SAC ¶ 54.

DAL cites two internet articles stating that it is already installing self-order kiosks at some Subway locations. *See* Def. Mot. at 9 n.2. As a preliminary matter, Plaintiff notes that whatever efforts DAL may have made in the direction of self-order kiosks cannot moot this action, as one of these articles, *kioskmarkeptlace.com*, reports that the kiosks will not be installed at all Subway locations, given factors like space, customer traffic, sales performance, and leases.[1] Compliance

---

[1] https://www.kioskmarketplace.com/articles/self-order-kiosks-play-key-role-in-subways-tech-redesign/.

with the ADA is not listed as among the considerations determining which restaurants will receive kiosks.

More importantly for purposes of the instant motion, Defendant's articles themselves provide Plaintiff's allegations with further factual support. *Kioskmarkeptlace.com* notes that store overhauls involving self-order kiosks are "now being rolled out to stores nationwide" and that "Subway announced 12 locations for the redesign in July." Notably, the article does *not* say, "Some of Subway's franchisees have now decided to experiment with self-order kiosks. Others have chosen not to." In the same vein, the *pyments.com* article cited by DAL describes the self-order kiosks as part of a "brand overhaul," not the independent venture of a few intrepid franchisees.[2]

DAL argues that "[t]he mere fact that DAL selects cash register providers for its franchisees does not plausibly give rise to an inference that DAL controls whether a franchise does or does not have self-serve kiosks." Def. Mem. at 9. But specific directives concerning what franchisees may or may not do as regards their POS Systems would be superfluous when the record makes it patent that DAL controls these systems in their entirety. If there could be any doubt on this point, it is eliminated by DAL's own articles. *Kioskmarkeptlace.com* reports that "[i]ntegrating the kiosk with Subway's existing software systems was challenging" for DAL's vendor Agilitee and that this also involved revamping the physical space of Subway restaurants. These hurdles make abundantly clear that franchisees have always been powerless to install kiosks without DAL's direction and involvement. To do so, franchisees would have to individually commission the design and production of a self-order kiosk that can be integrated with the POS System that DAL has already dictated they must use. If doing so proved "challenging" for Agiltree, a technologically

---

[2] https://www.pymnts.com/exclusive-series/qsr-and-mobile/2018/subway-restaurant-innovation-kiosks-loyalty/

sophisticated business specializing in POS Systems, then it is downright impossible for individual franchisees.

DAL accuses Plaintiff of "regurgit[ing]" a theory already rejected by the Court, "that Section 5(f) of the Franchise Agreement shows that DAL is an "operator" with respect to the restaurant's accessibility to the disabled." Def. Mem. at 9.  The SAC regurgitates nothing, however, because its allegations do not depend on the contents of the Franchise Agreement. DAL's regurgitation charge only holds water if we assume that Plaintiff may not allege facts outside the Franchise Agreement, and DAL cites no authority for this implausible proposition.

All the foregoing clearly establishes that DAL is an "operator" with respect to its franchisees' POS system, that its decisions, and not those of individual franchisees, are the reason why most Subway locations do not have self-order kiosks.  DAL "specifically controls" its franchisee with respect to the "allegedly discriminatory conditions." *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066-67 (5th Cir. 1995).  Its decisions are what prevent "the modification of the franchises to improve their accessibility to the disabled." *Id.* at 1066. In its motion to dismiss the First Amended Complaint, DAL observed that "provision of 'support' and maintaining of 'brand reputation'" are insufficient to establish its operator status (ECF # 47 at 10).  But the factual allegations in the SAC establish much more than general support and brand maintenance.  These allegations are not mere "labels and conclusions" or the "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 548. To the contrary, they speak directly to the complete control that DAL exercises over franchisees' POS Systems and thus establish its operator status for purposes of this action.

To the extent Plaintiff's well-documented allegations leave any doubts regarding DAL's status as an operator, it is inappropriate to resolve those doubts on a motion to dismiss, given that

8

"[t]he court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Oliver v. Rio Acquisition Partners, LLC*, 2019 WL 801952, at *2 (S.D.N.Y. Feb. 21, 2019). "[W]hether a particular franchisor may be held liable under the ADA as an operator is a question of fact, not law." *Johnson v. Winchester Campbell Props., LLC*, 18-cv-04153, 2018 U.S. Dist. LEXIS 213064, at *10 (N.D. Cal. Dec. 18, 2018). In *Neff*, which the Court has determined is the relevant precedent, the plaintiff's "only summary judgment evidence" was the defendant-franchisor's franchise agreement. *Neff*, 58 F.3d at 1065.  The franchise agreement provided defendant only with the power to "disapprove any proposed modifications" in the store building and equipment.  So the court found that this "limited form of control over structural modifications… which is essentially negative in character" did not establish that the defendant was an operator with respect to the removal of the relevant access barriers to the disabled. *Id*. at 1068. Accordingly, the court found that the franchisor did not prevent their removal "either as a practical matter or by exercising its rights under its franchise agreements." *Id*. at 1069. In contrast, However, Plaintiff Sullivan has plausibly alleged precisely what the *Neff* plaintiff could not allege. Under the Franchise Agreement, DAL selects the POS software its franchisees are required to use. And the factual record makes it abundantly clear that this "as a practical matter" precludes individual franchisees from installing self-order kiosks.

## II.   SELF-ORDER KIOSKS ARE NECESSARY FOR EFFECTIVE COMMUNICATION BETWEEN DEAF CUSTOMERS AND SUBWAY EMPLOYEES

DAL further argues that a "store or restaurant's failure to train its employees to provide effective assistance to customers with disabilities cannot be established by a single incident in which an employee failed to effectively communicate with a customer." Def. Mot. at 11 n.4.  In support of this, DAL cites *West v. Five Guys Enterprises, LLC* for the proposition that "[f]rom one isolated incident [of rudeness

9

or insensitivity], . . . no reasonable inference can be drawn that [defendant restaurant] fails to train its employees to provide effective auxiliary aids and services." Def. Mem. at 11-12 n.4 (quoting *West v. Five Guys Enterprises, LLC*, 2016 WL 482981, at *2 (S.D.N.Y. Feb. 5, 2016) (quotation marks and citations omitted)).

However, Plaintiff does not base his argument that the ADA requires DAL to install self-order kiosks solely on his own personal experience with a few rude Subway employees.  Beyond this, the SAC cites Jimmy Peterson, executive director of the Georgia Center of the Deaf and Hard of Hearing, who observes that self-order kiosks "could bridge a long-standing communications gap within the restaurant industry." Peterson notes that wrong orders accompanied by overcharging and employee frustration with deaf customers is "a pretty common mishap" at quick service restaurants. SAC ¶ 44. The opinion of a senior-level activist for the deaf and hard of hearing like Mr. Peterson is entitled to considerable weight. See *Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013) ("the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective.") (quoting U.S. Dep't of Justice, The Americans with Disabilities Act Title II Technical Assistance Manual, at II-7.1100 (1993)).

True enough, the ADA "does not 'regulate individuals' conduct so as to ensure that they will never be rude or insensitive to persons with disabilities." *Camarillo*, 518 F.3d at 157. But Plaintiff Sullivan's experience was just a particularly poignant manifestation of a recurring problem in settings like Subway. Even if Subway restaurants do not always treat deaf customers as rudely, indeed maliciously, as he was treated, it remains the case that interactions between employees and deaf customers at restaurants like Subway are fraught with miscommunication and frustration, as Mr. Peterson attests. Whether or not this gives rise to blatantly rude behavior in any given case, the deaf and hard of hearing are deprived of the full and equal enjoyment of Subway restaurants.

This may not hold true in every conceivable restaurant setting.  In fancier, more expensive venues, servers expect that they will need to patiently attend to the potentially unusual needs of fastidious customers, whatever these needs may be.  But this is not so in fast-paced, high volume quick service restaurants, and especially in ones like Subway, where the need to customize sandwiches to customer specifications places an added strain on employees, even under the best of conditions.  This can easily give rise to miscommunication, aggravation, and in some cases rudeness when deaf and hard of hearing customers present customer service employees with additional challenges for which they have no time or inclination. Self-order kiosks solve this recurring problem, which is not limited to cases like Plaintiff's. Defendant is certainly right that "[t]he type of aid or service necessary to ensure effective communication is context specific." Def. Mem. at 10. But Plaintiff's allegations take full account of the relevant context.

The above is why DAL is mistaken in arguing that "Franchisee's restaurant could have communicated with Plaintiff in writing using pen and paper" or by "communicat[ing] with Plaintiff by pointing and gesturing to the food available for placement on a sandwich." Def. Mem. at 10. In support of this contention, DAL cites *West v. Moe's Franchisor, LLC*, 15-cv-2846, 2015 U.S. Dist. LEXIS 165070 (S.D.N.Y. Dec. 9, 2015), where the court observed that "ADA regulations make clear that restaurants are permitted to use qualified readers to assist visually-impaired patrons with menu selections." *Id*. at 9.  Defendant also cites *Dicarlo v. Walgreens Boot All., Inc*., 2016 WL 482982 (S.D.N.Y. Feb. 5, 2016), where the court held that a store need not "use technology that allows" visually-impaired customer to "operate [beverage-ordering] machine independently" as long as store employees "effectively communicate with [the customer] such that he can enjoy the . . . machine." *Id*. at *2. See Def. Mot. at 11.

One cannot readily extrapolate from these cases to the instant action, however, given the nature of the communications involved.  The cited cases involved employees communicating to the

customer, where all that was required was reading written text aloud.  In contrast, this case involves a more complex interaction, where the disabled customer must communicate to the employee so that the employee can customize his or her order.  This creates all manner of opportunities for miscommunication. The employee may fail to understand the disabled customer's handwriting or believe he understands it while misinterpreting it.  A non-deaf customer can easily correct the employee when he observes the employee fulfilling his order wrongly. Not so with a deaf customer, who will have to go out of his way to get the employee's attention and will distract the latter from the task at hand in the process.  A non-deaf can also easily inform the employee if he changes his mind about, say, which condiments to add to the sandwich as the order is being fulfilled.  Not so with a deaf customer. Such problems lead easily to employee aggravation, which can then ensue in rudeness toward the deaf customer.  *See* 28 C.F.R. § 36.303(c)(1)(ii) (noting that "the type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place").

DAL quotes a Justice Department guidance for the proposition that "[i]n a retail setting, pointing to product information or writing notes back and forth to answer simple questions about a product may allow a person who is deaf to decide whether to purchase the product." *Id*. at 10. Yet this broad observation about what *may* be the case in retail settings generally sheds no light at all on the specific context of quick service restaurants like Subway.  More illuminating is the testimony of deaf activists and industry observers, cited in the SAC, attesting that human improvisation is a poor substitute for self-ordering kiosks in fast food settings, given the miscommunication and aggravation that often ensues, as explained above.  Moreover, the DOJ guidance quoted by DAL addresses the process of *obtaining* information, not that of *providing* it, while the DOJ statement of

interest quoted in the SAC actually addresses POS Systems and specifically endorses technological solutions to accommodate the disabled in this context, even where there may be other ways of doing so.  *See* SAC ¶¶ 41-43.

It may be tempting for non-disabled individuals to just wave away the difficulties faced by deaf customers in settings like Subway, given that communication through written notes or hand gestures seems theoretically doable when looked at from a distance.   But the documented experiences of Plaintiff and other deaf individuals reveals that theory is not so easily translated into practice. Even when they leave a restaurant like Subway with a sandwich, their overall experience is markedly different from that enjoyed by non-disabled customers, and restaurants would not devote such care to fostering a pleasant and welcoming environment for their customers if this was a trivial consideration. *See Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (the Second Circuit is particularly "mindful of the care exercised … to avoid hastily dismissing complaints of civil rights violations."); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134 (9th Cir. 2012) ("Disney argues vigorously in support of the district court's judgment that 'necessary' means only one thing: can't do without. Because Baughman <u>can</u> access Disneyland by using a wheelchair or scooter, a Segway isn't 'necessary' for her to use the park. QED. Read as Disney suggests, the ADA would require very few accommodations indeed. After all, a paraplegic <u>can</u> enter a courthouse by dragging himself up the front steps…").

Setting aside the practical difficulties created by the one-off human improvisations endorsed by DAL, there is no reason to subject disabled individuals to the social discomfort and stigma these improvisations involve (even at the hands of genuinely well-intentioned employees) when this can be eliminated by readily available technologies. As noted in the SAC, the trade publication *Modern Restaurant Management* observes that "[m]ost people with disabilities do not want to be treated

13

any differently from anyone else, and an in-person attendant often serves as a reminder of their disability." SAC ¶ 45. Preserving the dignity of the disabled is as central to the purposes of the ADA as is mitigating the various practical challenges they face. This moral objective is as much as anything why "[p]ublic accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman*, 685 F.3d at 1135. Self-ordering terminals offer efficiencies to disabled and non-disabled restaurant patrons alike. In allowing disabled individuals to easily blend in with other restaurant patrons, they facilitate the ADA's objective of promoting their social and economic integration. *See* Statement of Interest of the United States of America, *New v. Lucky Brand Dungarees Stores, Inc.* (14-cv-20574, S.D. Fla.), Dkt. No. 19, pg. 11 (04/10/2014) ("contrary to Lucky Brand's assertions …, the fact that Mr. New or other customers who are blind can complete their purchases through means other than a debit card does not support dismissal, as the ADA prohibits not only outright exclusion but also unnecessary differential treatment").

Courts have endorsed ADA accommodations in situations where the stakes were far less substantial than the very dignity of the disabled. The Ninth Circuit observed:

> What this means is illustrated by cases such as *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1085 (9th Cir. 2004), where we held that a theater was required to provide wheelchair seating for the disabled individual and an adjacent seat for his wife. The attendant seat was obviously not necessary for Fortyune to see the movie, but moviegoers expect to sit with their friends and family during the show; their enjoyment is diminished if they are forced to sit apart. "Because Fortyune require[d] an attendant to enjoy the viewing of a film, the modification that he requested, i.e., that [the theater] ensure that his companion could be seated next to him, was necessary." Id. at 1083 (emphasis added).

*Baughman*, 685 F.3d at 1135.

Here, the court was shielding disabled individuals from a misfortune that can befall anyone who has the bad luck of arriving too late to a crowded theater. While this may marginally diminish a

14

moviegoers enjoyment, most people easily move past the disappointment of sitting apart from friends or family for two hours without much thought. In contrast, the dignity of the disabled that self-order kiosks would guarantee is a much more substantial interest.  If the ability to sit silently next to friends and family for two hours at a movie theater is legally protected interest, then so too is the relief sought by Plaintiff Sullivan.

In *Innes v Bd. of Regents of the Univ. Sys. of Maryland*, deaf plaintiffs alleged that the University of Maryland violated the ADA by failing to modify two stadiums' large screens and scoreboards so as to enable the captioning of aurally delivered announcements during football and basketball games. Against this, Defendants argued "that they have offered reasonable accommodation by providing captioning that is supposed to be accessible on hand-held devices" and that "ADA Accessibility Guidelines do not require them to provide captioning in the form Plaintiffs request." *Innes v Bd. of Regents of the Univ. Sys. of Maryland*, 29 F Supp 3d 566, 578 (D. Md. 2014). However, plaintiffs alleged that captioning through hand-held devices like smart phones and tablets was inadequate because, *inter alia*, "deaf fans would be unable to speak to each other using sign language while holding the device on which they would read captions" and "to hold a snack and a drink while reading captions." *Id*. at 579-80. The court denied defendant's motion to dismiss. Again, if averting such discomforts and inconveniences is a cognizable interest under the ADA, then so too is protecting the very dignity of the deaf and hard of hearing, which is compromised when complex interactions with impatient restaurant employees force them to put their disability on fully display.

This consideration is all the weightier given that mandating self-order kiosks at Subway represents an at most minimal burden for DAL and its franchisees.  Unlike many adjustments that places of public accommodation have been required to make under the ADA and the New York

15

Laws, self-ordering terminals also benefit non-disabled customers and the business itself.  Self-ordering terminals are now widespread and cost-effective, and many restaurants have chosen to install them if only for the sake of economic efficiency. *See* SAC ¶ 36. The efficiencies of self-ordering terminals have been confirmed by studies.  *See* SAC ¶¶ 37-38. Indeed, the *pymnts.com* cited by DAL discloses that customers using what Subway kiosks do exist "tended to spend more," belying the suggestion that installing self-order kiosks would be unduly burdensome.  Certainly, there was a time when self-order kiosks might have been dismissed as an extravagant solution to the problems facing deaf and disabled customers.  But technological advancements mean this is no longer the case. The House Committee on Education and Labor stated its intent "that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times," and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities." H.R. Rep. No. 101-485, pt. 2, at 108 (1990). *See also Baughman*, 685 F.3d at 1135 ("Facilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons; they need only make accommodations that are reasonable. In deciding what's reasonable, facilities may consider the costs of such accommodations, disruption of their business and safety. But they must also take into account evolving technology that might make it cheaper and easier to ameliorate the plight of the disabled.")

Although DAL argues that "[t]he ADA does not mandate a specific high-tech solution to a problem that could easily be solved by written communication and/or hand gestures," Def. Mot. at 11, the determination of whether these expedients truly constitute effective communication

16

cannot be made on a motion to dismiss, as DAL now urges. "[T]he flexibility to provide reasonable accommodation is an affirmative defense and not an appropriate basis upon which to dismiss the action." *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 956 (N.D. Cal. 2006). "Although [DAL is] correct that auxiliary aids and services do not necessarily need to take a particular form in order to constitute effective communication, at this stage, it is inappropriate to resolve factual disputes between the parties regarding whether [DAL's] accommodation provides effective communication." *Innes*, 29 F. Supp. 3d at 580.

While Plaintiff has cited ample grounds for concluding that one-off human improvisation cannot remedy the access barriers that he and other deaf customers face at Subway restaurants, it is ultimately Defendant's burden to demonstrate that such improvisation *is* an effective remedy. *See N.A. of the Deaf v Harvard Univ.*, 3:15-cv-30023, 2016 US Dist. LEXIS 120121, at *39-40 (D. Mass Feb. 9, 2016) ("After [P]laintiffs state a claim — by alleging that [Harvard's online audiovisual content] is not accessible to the [deaf] — the burden then shifts to [Harvard] to assert, as an affirmative defense, that [it] already provide[s] the information ... in another reasonable format....") (internal quotes and citation omitted). Accordingly, the earliest possible time the court can rule on the effectiveness of DAL's proffered alternative solution is on a motion for summary judgment. See *Noll v. IBM*, 787 F.3d 89, 94 (2d Cir. 2015) ("The reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder… But in a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'"); *Camarillo*, 518 F.3d at 158 ("[S]ummary judgment is warranted where all the evidence in the record demonstrates that the defendants have taken all necessary steps 'to ensure that no individual with a disability is excluded, denied services,

17

segregated   or   otherwise   treated   differently   than   other   individuals.' 42   U.S.C.   §
12182(b)(2)(A)(iii). Here, there is no such evidence -- as this was a motion to dismiss…")

**<u>CONCLUSION</u>**

For all the foregoing reason, Defendant's motion to dismiss should be denied in its entirety.

Dated: March 23, 2020

Respectfully submitted,

 /s/ *C.K. Lee*
By:  C.K. Lee, Esq.

LEE LITIGATION GROUP, PLLC
C.K. Lee (CL 4086)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2020, a true and correct copy of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint was served on Defendant via ECF.

*/s/ C.K. Lee*
C.K. Lee, Esq.
